IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| ANTHONY SCHWENDINGER,<br><br>Plaintiff,<br><br>v.<br><br>MERCY MEDICAL CENTER-CLINTON, INC., MEDICAL ASSOCIATES OF CLINTON IOWA, PLC, GATEWAY SURGERY CENTER, L.C., MORRISON COMMUNITY HOSPITAL, MARK LEDING, STEPHEN JEWELL, and JAMES BABESHOFF,<br><br>Defendants. | No: 3:13-cv-00039-HDV-RAW<br><br><br><br>MEMORANDUM OPINION, RULINGS ON MOTIONS, AND ORDERS OF DISMISSAL |

Plaintiff Anthony Schwendinger brings this case against multiple defendants claiming violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2, and various state laws. This court has federal question subject matter jurisdiction over the Sherman Act claims, 28 U.S.C. § 1331, and supplemental subject matter jurisdiction over the state law claims, 28 U.S.C. § 1367.

Before the court are two Rule 12(b)(6) motions to dismiss for failure to state a claim upon which relief can be granted filed by defendant Mercy Medical Center-Clinton, Inc. (Mercy) and by defendants Mark Leding, DO, Stephen Jewell, CRNA, and James Babeshoff, CRNA (Leding et al.), respectively. Fed. R. Civ. P. 12(b)(6). Defendant Morrison Community Hospital District (MCHD) moves to dismiss for lack of personal jurisdiction, Fed. R. Civ. P. 12(b)(2), and joins Mercy's motion to dismiss for failure to state a claim upon which relief can be granted, Fed. R. Civ. P. 12(b)(6). Also before the court is plaintiff's Rule 12(f) motion to strike affirmative defenses from the answer filed by defendants Medical Associates of Clinton Iowa,

PLC (Medical Associates) and Gateway Surgery Center, L.C. (Gateway).  Fed. R. Civ. P. 12(f).

Medical Associates and Gateway move to file an amended answer, and plaintiff does not resist.

Thus, the motion to amend will be granted and the motion to strike affirmative defenses denied.

With my permission, plaintiff and MCHD engaged in jurisdictional discovery and both parties

have submitted subsequent supplemental briefing.

## RULE 12(b)(6) MOTION TO DISMISS STANDARDS

Under Rule 12(b)(6), a defendant is entitled to dismissal of any count of a complaint that

"fail[s] to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  When

addressing a Rule 12(b)(6) motion, the allegations of the complaint are assumed to be true.  Cruz

v. Beto, 405 U.S. 319, 322 (1972).  The "complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556

U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A

claim is plausible on its face if the court can reasonably infer from the pleaded facts "that the

defendant is liable for the misconduct alleged."  Id. (citing Twombly, 550 U.S. at 556).

> The plausibility standard is not akin to a "probability requirement," but it asks for
> more than a sheer possibility that a defendant has acted unlawfully.  Where a
> complaint pleads facts that are "merely consistent with" a defendant's liability, it
> "stops short of the line between possibility and plausibility of 'entitlement to
> relief.' "

Id. (citing Twombly, 550 U.S. at ibid., 557 (quoting Fed. R. Civ. P. 8(a)(2)).  If, on a 12(b)(6)

motion, either party submits factual matters outside the pleadings and they are not excluded, the

motion must be converted to a motion for summary judgment.  Fed. R. Civ. P. 12(d).

Accordingly, for consideration of the Rule 12(b)(6) motions, all factual matters that the parties

submitted that are outside the pleadings are excluded and not considered.

2

## RULE 12(b)(2) 1MOTION STANDARDS

In respect to MCHD's motion to dismiss for lack of personal jurisdiction, plaintiff bears the ultimate burden of proving personal jurisdiction. Dakota Indus. v. Dakota Sportswear, Inc., 946 F.2d 1384, 1387 (8th Cir. 1991). "[J]urisdiction need not be proved by a preponderance of the evidence until trial or until the court holds an evidentiary hearing." Id. (citing Cutco Ind. v. Naughton, 806 F.2d 361, 365 (2d Cir. 1986)). Neither party requested an evidentiary hearing on the motion. If an evidentiary hearing is not held, the plaintiff needs only make a prima facie showing of personal jurisdiction to defeat a motion to dismiss for lack of personal jurisdiction. Id. (citing Watlow Elec. Mfg. v. Patch Rubber Co., 838 F.2d 999, 1000 (8th Cir. 1988)). Pleadings and affidavits are viewed in the light most favorable to the plaintiff, and all factual conflicts are resolved in plaintiff's favor. Id. (citing Watlow, 838 F.2d at 1000, and Nieman v. Rudolf Wolff & Co., Ltd., 619 F.2d 1189, 1190 (7th Cir. 1980)).

## BACKGROUND FACTS

For purposes of addressing defendants' Rule 12(b)(6) motions to dismiss, the factual allegations in plaintiff's complaint are accepted as true. Iqbal, 556 U.S. at 678. For purposes of addressing MCHD's motion to dismiss for lack of personal jurisdiction, pleadings and affidavits are viewed in the light most favorable to plaintiff, and all factual conflicts are resolved in his favor. Dakota, 946 F.2d at 1387.

Plaintiff Anthony Schwendinger is a certified registered nurse anesthetist ("CRNA") who resides in Clinton, Iowa. Defendant Mark Leding, DO, is a doctor specializing in anesthesiology. Defendants Stephen Jewell and James Babeshoff are both certified registered nurse anesthetists. Dr. Leding, Mr. Jewell, and Mr. Babeshoff provide anesthesia services in the

3

Clinton-Morrison area.  Mercy is a full-service health system serving Clinton residents and persons from surrounding eastern Iowa and northwestern Illinois communities.  Medical Associates is a forty-doctor multi-specialty group located in Clinton and serves the Clinton County, Iowa, and Whiteside County, Illinois, area.  Gateway is an outpatient surgery center located, and serving patients, in the Clinton area and is owned by Medical Associates.

MCHD is an Illinois not-for-profit corporation providing medical, surgical, radiology, laboratory, inpatient pharmacy, and emergency services to people in Morrison, Illinois, and surrounding areas.  Morrison is the county seat of Whiteside County and is approximately twelve miles from Clinton across the Mississippi River.  Morrison has an approximate population of 4,181 while Clinton's population is approximately 26,830.

MCHD advertises both by print and by television.  As a result of Morrison's proximity to Clinton, MCHD advertises its services in the Clinton Herald, a newspaper published in Clinton. MCHD has advertised in the paper every week since 2003.  As part of its advertising package, four additional MCHD advertisements were circulated by means of a Herald-related newsletter reaching its subscribers in Iowa and Illinois between November 2012 and February 2013.  Also as part of its Herald advertising package, MCHD's advertisement ran in a quarterly magazine called Bridges, which reached Herald subscribers in Iowa and Illinois.  In addition to Clinton, the Herald also circulates in Morrison, Fulton, and other Illinois communities across the river from Clinton.  MCHD asserts that it targets the Illinois recipients of the Herald.  MCHD also advertises in the Herald to fill employment positions.  Within the last five years, MCHD also advertised in the Quad City Times, a much larger Iowa newspaper that also circulates in Illinois.

4

The four cities making up the Quad Cities are Rock Island and Moline, Illinois, and Davenport and Bettendorf, Iowa.

MCHD also advertises on Rock Island television station CBS4 WHBF-TV, which broadcasts its signal into Iowa and is, and was, also available in Iowa cities near Rock Island by means of cable television providers.  MCHD advertised on CBS4 multiple times per week beginning in January 2012 and continuing to the present.  It has run at least two different advertisements on CBS4.

MCHD maintains a website that notes, among other things, "Morrison Community Hospital provides many services to the community and surrounding areas."  The website is interactive to the extent that visitors can apply for jobs or pay bills, but MCHD does not sell or render services online.  Instead, the site is primarily informational and discusses the healthcare services provided.  Advertisements also run on both the CBS4 and Clinton Herald websites as elements of MCHD's respective television and print advertising packages.

MCHD employs or employed many Iowa residents, including doctors, nurses and emergency medical technicians.  Twelve percent of MCHD employees are Iowa residents.  Morrison also grants medical privileges to doctors residing in Iowa.

From 1985 and until shortly after this suit commenced, Mercy and MCHD had an agreement in place under which Mercy provided management services to MCHD.  Former MCHD CEO Kent Jorgensen simultaneously served in that role and as a vice president for Mercy in Iowa.  More than five of MCHD's previous CEOs (including Mr. Jorgensen) were simultaneously Mercy employees.

Although the management relationship with Mercy ended in 2012, MCHD maintains a critical access hospital network agreement with Mercy.  The State of Illinois requires "critical access hospitals" to associate with a hospital that provides a higher level of care.  This agreement provides for referrals and transfers of critical care patients to Mercy for certain types of acute care that MCHD is unable to provide.  MCHD would send at least ten and perhaps as many as fifty patients per year to Iowa if MCHD could not provide care.

Mercy also performed lab services for MCHD if the latter did not have the correct equipment or its equipment was not working.  Even after the Mercy management relationship was terminated, Mercy performed more than twenty tests per month.  MCHD employees would drop off or pick up labs from Mercy on a daily basis.  MCHD did not perform the lab tests; it only dropped off the specimens.  MCHD employees were compensated for these trips to Iowa.

MCHD also entered into an agreement with Mercy to lease its mobile ultrasound system with echocardiography ultrasound.  Under the agreement, MCHD gave Mercy the use of dedicated garage space in Illinois for a mobile ultrasound van and provided personnel to operate the ultrasound for at least two hours per day, two to three days per week, as dictated by patient volume.  Provision of the ultrasound services occurred in Morrison, Illinois.

MCHD also has a laundry services agreement with Mercy under which Mercy picks up soiled linens from, and delivers clean linens to, MCHD three times per week or as needed. Under the agreement, MCHD does not provide any service to Mercy.  MCHD also leases a Mercy employee: Cindy Johnson, ARNP.  MCHD also has a contract with Acute Care—a Des Moines, Iowa, company—to staff its emergency department with emergency room physicians, all of whom reside in Illinois.

MCHD has a relationship with Hamilton Technical School, located in Davenport, Iowa, which began in 2008 and is ongoing.  MCHD allows Hamilton students to receive clinical training at MCHD for various periods of time.  Visiting students are not employees of MCHD and receive no compensation, fringe benefits, worker's compensation, unemployment compensation, or income under the minimum wage laws.  Hamilton does not pay MCHD to train the students, and MCHD does not pay to have the students train in Morrison.

In 2012, MCHD had 500 visits from Iowa patients.  It is not clear from the record whether any, or many, of these visits were repeat visits by the same patient.  Iowa patients receive same services at MCHD as Illinois patients.  MCHD therefore receives revenue from Iowa patients and Medicaid.

Other MCHD contacts with Iowa include its senior leadership traveling to Des Moines, Iowa, for the annual Iowa Hospital Association meeting in June 2012.  The meeting provided participants with "an overview of what's going on in the state."  Further, MCHD leaders attended leadership training in Iowa once a year in areas including conflict management, conducting an interview, and employee communication.  MCHD employees were compensated for the time they spent in Iowa at leadership training.  A review of MCHD's January and February 2012 phone bills reveals that 10 to 20 telephone calls per month were placed to Iowa.

Plaintiff's reputation as a qualified CRNA within the Clinton-Morrison area is well known.  In February 2005, plaintiff began employment with Pain Consultants, P.C., an Iowa professional company that operates out of and maintains its registered office in Iowa.  At all relevant times, plaintiff was employed by Pain Consultants to provide anesthesia services at locations with which Pain Consultants had a contract, including defendants Mercy, Gateway, and

MCHD (hereinafter collectively the facilities).  MCHD entered into an agreement with Pain Consultants on or around November 1, 2010, to provide anesthesia services.  As a result of his employment with Pain Consultants, plaintiff provided anesthesia services to MCHD on more than twenty-five occasions. On some number of these occasions, he served Iowa patients at MCHD.

Dr. John Dooley is Pain Consultants' owner and he considered plaintiff his most loyal and dedicated service provider.  Dr. Leding, Mr. Babeshoff, and Mr. Jewell also provided anesthesia services on behalf of Pain Consultants.  Plaintiff had been with Pain Consultants for the longest amount of time.  Because Dr. Dooley was often not present at a Facility, plaintiff regularly reported to him regarding his view of other Pain Consultants providers' conduct, the perception of their services on the part of the respective facilities, and provision of anesthesia services generally.

Pain Consultants has or had exclusive agreements with each of the facilities to provide anesthesia services.  Provisions of those agreements indicate that the facilities would not have input into how Pain Consultants provided anesthesia services, including to work assignments, work locations, and personnel decisions.  Accordingly, under the agreements Pain Consultants had discretion as to how it provided anesthesia services.  The exclusivity of the arrangement was to be voided if Pain Consultants failed to provide adequate anesthesia services at a Facility. Adequate services included maintaining an adequate number of anesthesiologists or CRNAs to cover a Facility's needs and also ensuring that its providers performed properly.

Plaintiff worked efficiently and without incident at the facilities.  He was never made a party to a medical malpractice claim, insurance claim, or other claim arising out of his patient

care; he was not subjected to a privileges review process, nor was he subject to any disciplinary proceeding; he was never notified of or the subject of any complaint, proceeding, or program in accordance with the facilities' policies regarding alcohol or substance abuse; and he was never notified by the facilities in writing regarding any concerns or complaints surrounding his patient care or other services. His anesthesia and patient care services at the facilities met or exceeded the standard of care.

Dr. Leding worked for Pain Consultants as an independent contractor beginning in or around June 2008. During the past ten years, he has been disciplined by the Iowa Board of Medicine on multiple occasions for professional incompetency and knowingly making misleading, deceptive, untrue, or fraudulent representations in the practice of medicine. He was placed on probation from 2002 to 2007. In 2008, prior to beginning his independent contractor relationship with Pain Consultants, he applied to Mercy directly; it refused to hire him. Dr. Leding's contract with Pain Consultants prohibited him from providing anesthesia services to the facilities, or elsewhere in the area, unless he provided the services through Pain Consultants. Dr. Leding continuously sought to be released from his contract with Pain Consultants to be able to work directly for Mercy. From April 2004 until September 2011, Dr. Dooley served as Mercy's medical director, and from April 2011 through September 2012, he was the head of its anesthesia department. Dr. Leding sought to replace Dr. Dooley in his role as head of the anesthesia department.

Mr. Jewell and Mr. Babeshoff were also employed by Pain Consultants. Like Dr. Leding, by the terms of their respective agreements, they could not provide anesthesia services to the facilities except through Pain Consultants. Dr. Leding, Mr. Jewell, and Mr. Babeshoff

each viewed plaintiff as a competitor who took substantial business from them. Each also saw him as an obstacle to their separating from Pain Consultants, leaving behind the restrictive terms of that employment arrangement, and working for Mercy directly. Each hoped to reduce competition in anesthesia services at Mercy and in the surrounding area.

Dr. Leding, Mr. Jewell, and Mr. Babeshoff each made false statements about plaintiff's abilities and professional services to Dr. Dooley, other physicians, nurses, other health care providers, and personnel associated with the facilities. Each also made false statements regarding plaintiff's history of alcoholism and his current health condition, claiming that he had "fallen off the wagon" and had provided patient care while impaired. Each also made false statements regarding plaintiff's care of certain patients, including that he slept through procedures. Plaintiff reported Dr. Leding's bullying behavior to Mercy on at least three occasions, and, despite maintaining a specific policy and procedure regarding such reports, Mercy did nothing to address or resolve the issue.

On February 15, 2012, Dr. Leding called Dr. Dooley and falsely told him that plaintiff provided improper patient care and was under the influence of alcohol at Mercy. The following day, Dr. Dooley spoke with various Mercy representatives regarding Dr. Leding's accusations. He then confirmed that plaintiff had not received any written communication from Mercy revoking or suspending his privileges. Dr. Dooley directed plaintiff to report as scheduled on February 17, but upon arriving, plaintiff discovered that Dr. Dooley had not put him on the anesthesiology schedule.

Later that day, Mercy's President and CEO, Sean Williams, contacted Dr. Dooley and expressed concerns about plaintiff's patient care. Dr. Dooley doubted the validity of the reports

and urged Mercy to conduct an official investigation.  Mr. Williams instead appointed an

informal ad hoc group, which included Dr. Leding, Dr. Dooley, Carla Tarrant, Amy Bernetes,

Dr. Surendra Kumar, and Dr. James Olney to consult with Mr. Williams about the allegations

against plaintiff.  On February 17, Dr. Dooley informed plaintiff that his access to Mercy had

been blocked pending results of the informal investigation.  The investigation focused on care

provided to three patients, two of whom Dr. Leding also treated.  A review of the cases revealed

no deviation from the standard of care by plaintiff.  Dr. Leding's actions put the patients at risk,

however, and Dr. Leding tried to conceal it.

On March 5, plaintiff attended a meeting with Dr. Surendra Kumar and Dr. Dooley, who

were both on the committee, and Linda Hoppe, Mercy's director of risk management.  At the

meeting, the parties discussed the events that occurred in February and the reasons for plaintiff's

removal from active practice.  Dr. Dooley anticipated that plaintiff would return to work before

the end of that week because no evidence of improper patient care was found.

On March 9, Dr. Dooley met with the ad hoc group, and the other members had shifted

their focus from the three cases of alleged improper patient care to the allegations of plaintiff's

purported alcoholism.  Dr. Dooley expressed his opinion that plaintiff was not impaired, but Mr.

Williams disagreed.  Dr. Dooley learned that Mercy would no longer compensate Pain

Consultants for plaintiff's services.  Mr. Williams instructed Dr. Dooley not to assign plaintiff

work at Mercy because plaintiff was precluded from seeing patients at Mercy.

At the time, MCHD CEO Kent Jorgenson was an Iowa resident and was also employed

by Mercy.  Shortly after learning of Mercy's decision, Dr. Dooley was contacted by Marsha

Croger, MCHD's director of nursing.  Pursuant to Mr. Jorgenson's instructions, Ms. Croger

informed Dr. Dooley that due to plaintiff's problems with Mercy, he was also prohibited from providing anesthesia services at MCHD.  Later that same day, however, Ms. Croger contacted Dr. Dooley, apologized for her prior communication, and asked if plaintiff could work at MCHD on three upcoming surgery days, which plaintiff did.  Shortly thereafter, Mr. Jorgensen contacted Dr. Dooley personally to inform him that plaintiff was no longer permitted to provide anesthesia services at MCHD.  Dr. Dooley responded that such action was in violation of MCHD's bylaws and its contract with Pain Consultants.  Mr. Jorgensen dismissed these objections.

Around the same time, a representative from Gateway also contacted Dr. Dooley to inform him that plaintiff was prohibited from providing anesthesia services at Gateway.  Dr. Dooley inquired whether complaints had been lodged against plaintiff, and was told that none had been.  By March 31, 2012, each of the facilities had prohibited plaintiff from seeing patients. Because he could not fulfill the majority of duties required by his agreement with Pain Consultants, plaintiff was discharged from his employment.

Each of the facilities has bylaws and other governing documents that provide for specific procedures for revoking practitioners' privileges.  These procedures include the rights to notice of any allegations of malfeasance and an opportunity to respond.  Plaintiff was not provided either.

All defendants were aware of plaintiff's employment contract with Pain Consultants, making him one of a limited group of persons able to provide anesthesia services to the facilities. The facilities sought to void Pain Consultants' exclusive provision of anesthesia services by precluding plaintiff from seeing patients at the facilities.  The facilities, Dr. Leding, Mr. Babeshoff, and Mr. Jewell stood to benefit economically by precluding plaintiff from providing

services at the facilities and raising concerns about Pain Consultants' provision of services. Accordingly, they pursued a course of conduct designed to: (1) preclude plaintiff from providing anesthesia services at the facilities; (2) secure Dr. Leding's appointment as director of anesthesia at Mercy; (3) force Pain Consultants to terminate its exclusive agreements with the facilities; and (4) cause Pain Consultants to release Dr. Leding, Mr. Babeshoff, and Mr. Jewell from their exclusive contracts.  Plaintiff had expected to be employed and provide services to the facilities for several years into the future.

These parties had an understanding or agreement that they would "blackball" or otherwise deny employment to those who had either been fired or rejected for employment by any of the facilities.  Defendants' purpose was to restrain trade and competition in the Clinton-Morrison market for anesthesia services.

During or around August 2012, Pain Consultants entered into a new agreement with Mercy that terminated the old contact, allowed Dr. Leding, Mr. Babeshoff, and Mr. Jewell to practice at Mercy notwithstanding their agreements with Pain Consultants, and set an end date for their employment contract with Pain Consultants.  As of March 2013, Dr. Leding was director of anesthesiology at Mercy, and Mr. Babeshoff and Mr. Jewell are employed there.

After the facilities precluded plaintiff from providing anesthesia services, he applied for employment at other medical facilities, both local and distant.  The other facilities refused to consider him because Mercy and Dr. Leding provided false, incomplete, or otherwise improper responses to their inquiries.  Specifically, plaintiff applied to a medical center in northern Iowa, but based on conversations with the facility, he voluntarily withdrew his application because Mercy failed to complete a reference request form.  Due to Mercy's failure to respond, if

plaintiff had not withdrawn his application, the other medical facility would have denied his request for privileges and reported the denial to the National Practitioner Data Bank.  Despite diligent efforts to secure employment since being precluded from seeing patients at the facilities, plaintiff has been unable to secure employment providing anesthesia services.

Plaintiff brings this suit alleging in Counts I, II, and III, that defendants' conduct affected the quantity and quality of, reduced competition in, and illegally created and exploited monopoly power in, anesthesia services in the Clinton-Morrison area, thus violating the Sherman Act, 15 U.S.C. §§ 1-2, and the Iowa Competition Law, Iowa Code § 553.4.  Plaintiff also alleges that defendants conspired to harm him (Count IV), tortiously interfered with his employment contract (Count V) and with his third-party-beneficiary status in respect to the exclusive agreement between Pain Consultants and the facilities (Count VI), tortiously interfered with his prospective business opportunities (Count VII), defamed him (Count VIII), intentionally inflicted emotional distress on him (Count IX), and blacklisted him in violation of Iowa Code § 730.1 (Count X).

## DISCUSSION

## I.  PERSONAL JURISDICTION

Defendant MCHD argues that the court does not have personal jurisdiction over it.  To determine whether it has personal jurisdiction over a party, a district court must first examine whether the exercise of personal jurisdiction is proper under the forum state's long-arm statute; if so, the second question is whether the exercise of jurisdiction comports with the Due Process Clause of the Fourteenth Amendment to the United States Constitution.  Dakota Indus., Inc. v. Dakota Sportswear, Inc., 946 F.2d 1384, 1387-88 (8th Cir. 1991).  The Iowa long-arm statute confers personal jurisdiction to the extent allowed under the United States Constitution.  See id.

at 1389 (noting Iowa R. Civ. P. 1.306 permits Iowa courts to exercise jurisdiction not contrary to the Constitution).  Accordingly, the long-arm question is folded into the due process question, and this court may exercise personal jurisdiction over any person to the extent allowed by due process.  See id. at 1387-88; Iowa R. Civ. P. 1.306.

Due process requires that in order to subject a nonresident to jurisdiction, the nonresident must have "certain minimum contacts with [the state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' "  Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (citations omitted).

> The application of [the minimum contacts] rule will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.

Hanson v. Denckla, 357 U.S. 235, 253 (1958).  The Supreme Court has repeatedly applied the "purposefully avails" requirement of Hanson.  See Burger King, 471 U.S. at 474-75; World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980); Kulko v. Ca. Superior Court, 436 U.S. 84, 94 (1978).  The contacts with the forum state must be more than " 'random,' 'fortuitous,' or 'attenuated.' "  Burger King, 471 U.S. at 475 (citations omitted).  Minimum contacts must exist either at the time the cause of action arose, the time the suit is filed, or within a period of time immediately prior to the filing of the lawsuit.  Percoraro v. Sky Ranch for Boys, Inc., 340 F.3d 558, 562 (8th Cir. 2003) (citing Clune v. Alimak AB, 233 F.3d 538, 544 n.8 (8th Cir. 2000)).

Courts may exercise either specific or general personal jurisdiction over defendants.  Bell Paper Box, Inc. v. U.S. Kids, Inc., 22 F.3d 816, 819 (8th Cir. 1994).  "Specific" jurisdiction

refers to situations in which a court exercises jurisdiction in a cause of action that arises out of or relates to the defendant's contacts with the forum.  Id.  A court can exercise "general" jurisdiction if the defendant's contacts with the forum are sufficient that it is not necessary for the contacts to relate to the cause of action.  Beverly Hills Fan Co. v. Royal Sovereign Corp., 21 F.3d 1558, 1563 n.10 (Fed. Cir. 1994) (citing Burger King, 471 U.S. at 473 n.15).

The Eighth Circuit evaluates the following factors to determine whether exercising jurisdiction is proper under the Due Process Clause: (1) the nature and quality of the contacts with the forum state; (2) the quantity of contacts with the forum state; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience of the parties.  Dakota, 946 F.2d at 1390; Land-O-Nod Co. v. Bassett Furniture Indus., 708 F.2d 1338, 1340 (8th Cir. 1983).  The first three factors are the most important.  Id.

Plaintiff asserts that MCHD's Iowa contacts were sufficient to support either specific or general jurisdiction.  MCHD had substantial contacts with Iowa, and many of those contacts relate to the harm alleged in plaintiff's complaint. Due to an agreement between the two hospitals, Mercy, an Iowa organization, provided management services to MCHD at the time the events in question occurred.  Mr. Jorgenson, MCHD's Iowa-based CEO, who was a Mercy employee, made the decision that plaintiff could no longer provide anesthesia services at MCHD.  Moreover, MCHD entered into an anesthesia services contract with Pain Consultants, an Iowa company.  Pain Consultants provided anesthesia services for multiple Iowa residents to MCHD.  "[W]ith respect to interstate contractual obligations, we have emphasized that parties who 'reach out beyond one state and create continuing relationships and obligations with citizens

of another state' are subject to regulation and sanctions in the other State for the consequences of

their activities." *Burger King*, 471 U.S. at 473 (quoting *Travelers Health Assn. v. Virginia,* 339

U.S. 643, 647 (1950)).  MCHD clearly reached out to Iowa residents and created relationships

and obligations with them.

> Moreover, where individuals "purposefully derive benefit" from their interstate
> activities, *Kulko[ ],* 436 U.S. [at] 96[], it may well be unfair to allow them to
> escape having to account in other States for consequences that arise proximately
> from such activities; the Due Process Clause may not readily be wielded as a
> territorial shield to avoid interstate obligations that have been voluntarily
> assumed. And because "modern transportation and communications have made it
> much less burdensome for a party sued to defend himself in a State where he
> engages in economic activity," it usually will not be unfair to subject him to the
> burdens of litigating in another forum for disputes relating to such activity.
> *McGee v. International Life Insurance Co.*, [] 355 U.S. [220, 223 (1957)].

*Burger King*, 471 U.S. at 473-74.

> Thus where the defendant "deliberately" has engaged in significant activities
> within a State, *Keeton v. Hustler Magazine, Inc., supra,* 465 U.S., at 781, 104
> S.Ct., at 1481, or has created "continuing obligations" between himself and
> residents of the forum, *Travelers Health Assn. v. Virginia,* 339 U.S., at 648, 70
> S.Ct., at 929, he manifestly has availed himself of the privilege of conducting
> business there, and because his activities are shielded by "the benefits and
> protections" of the forum's laws it is presumptively not unreasonable to require
> him to submit to the burdens of litigation in that forum as well.

*Burger King*, 471 U.S. at 475-76.  MCHD deliberately created continuing obligations with

residents of Iowa and has availed itself of the privilege of conducting business with those Iowa

residents.  Moreover, MCHD has many contacts with Iowa that do not specifically relate to the

litigation at hand but would arguably support general personal jurisdiction.  Iowa has a strong

interest in providing its residents with a forum to seek a remedy for alleged harms, and MCHD's

proximity to the state minimizes any burden of litigating claims in Iowa.  Thus, requiring MCHD

to submit to litigation in Iowa does not offend due process.  Accordingly, MCHD's motion to dismiss for lack of personal jurisdiction will be denied.

## II.     ANTITRUST VIOLATIONS

Defendants move to dismiss plaintiff's antitrust claims in Counts I, II, and III for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  Plaintiff alleges in those counts that defendants' conduct affected the quantity and quality of, reduced competition in, and illegally created and exploited monopoly power in, anesthesia services in the Clinton-Morrison area, thus violating the Sherman Act, 15 U.S.C. §§ 1-2, and the Iowa Competition Law, Iowa Code § 553.4.  Defendants allege that plaintiff has not sufficiently alleged antitrust injury, he is not an efficient antitrust enforcer, his claims are not "per se antitrust violations," and his claims fail under "rule of reason" analysis.

Section 1 of the Sherman Act provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States . . . is declared to be illegal."  15 U.S.C § 1.  Section 2 provides: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States . . . shall be deemed guilty of a felony . . . ."  15 U.S.C § 2.  Provisions of the Clayton Act allow private suits for treble damages or injunctive relief for those injured by antitrust violations.  15 U.S.C. §§ 15, 26.

For a plaintiff to have standing to bring a Clayton Act suit for violations of the Sherman Act, a plaintiff must establish the following:

> (1) the causal connection between the alleged antitrust violation and the harm to the plaintiff; (2) improper motive; (3) whether the injury was of a type that Congress sought to redress with the antitrust laws; (4) the directness between the injury and the market restraint; (5) the speculative nature of the damages; and (6) the risk of duplicative recoveries or complex damage apportionment.

18

Davies v. Genesis Med. Ctr. Anesthesia & Analgesia, P.C., 994 F. Supp. 1078, 1092 (S.D. Iowa 1998) (citing Lovett v. Gen. Motors Corp., 975 F.2d 518, 520 (8th Cir. 1992)).  The Iowa Competition Law requires the same showing.  See Iowa Code § 553.2 ("This chapter shall be construed to complement and be harmonized with the applied laws of the United States which have the same or similar purpose as this chapter. This construction shall . . . be made to achieve uniform application of the state and federal laws prohibiting restraints of economic activity and monopolistic practices.")

 Defendants argue first that plaintiff has failed to allege antitrust injury, *i.e.*, either that prices will increase above, or supply will be reduced below, competitive levels.  Davies, 994 F. Supp. at 1093.  The Sherman Act prohibits *unreasonable* restraints of trade, not restraints of trade generally, for every commercial contract between parties is technically a restraint of trade. Nat'l Collegiate Athletic Ass'n v. Bd. of Regents, 468 U.S. 85, 99 (1984).  The antitrust injury requirement comes from the Clayton Act, which "provides a vehicle for private enforcement of the antitrust laws.  Under § 4, 'any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States . . . ."  Cargill, Inc. v. Monfort of Colo., Inc., 479 U.S. 104, 109 (1986) (quoting 15 U.S.C. § 15).  "A private plaintiff can recover on an antitrust claim only where the loss 'stems from a competition-reducing aspect or effect of the defendant's behavior.' "  Davies, 994 F. Supp. at 1093 (quoting Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 344 (1990)). "The antitrust laws  .  .  .  were enacted for 'the protection of competition not competitors.' " Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 488 (1977) (quoting Brown Shoe Co. v. United States, 370 U.S. 294, 320 (1962)).  Antitrust injury, then, is "injury of the type the

antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.  The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation."  Id. at 489.  The same antitrust injury requirement applies to plaintiff's claims for damages under § 15, and for injunctive relief under § 26, of the Clayton Act, 15 U.S.C. §§ 15, 26.  Cargill, 479 U.S. at 111.

Medical practitioners who are denied privileges at hospitals or even at multiple hospitals in a geographic area have a difficult road in establishing standing to bring an antitrust claim.  See e.g. Davies, 994 F. Supp. at 1093-96 (anesthesiologist did not establish antitrust injury or efficient enforcer status); Todorov v. DCH Healthcare Auth., 921 F.2d 1438, 1453-54 (11th Cir. 1991) (doctor denied privileges did not incur antitrust injury because he sought to profit from the anticompetitive venture); Wagner v. Magellan Health Servs., Inc., 121 F. Supp. 2d 673, 681-82 (N.D. Ill. 2000) (doctor precluded from providing emergency psychiatric care did not allege antitrust injury or that he was a proper antitrust plaintiff); Baglio v. Baska, 940 F. Supp. 819, 829-30 (W.D. Pa. 1996) aff'd, 116 F.3d 467 (3d Cir. 1997) (injury to a doctor denied privileges was not the result of the anticompetitive effects of the agreement and the direct consumers harmed by the reduction in competition were proper antitrust plaintiffs, not the doctor).  Injury to a plaintiff's professional prospects is not normally a sufficient claim of antitrust injury; the anticompetitive injury is to consumers of the professional services in the form of increased prices or reduced output.  Todorov, 921 F.2d at 1453-54; Wagner, 121 F. Supp. 2d at 681-82; Baglio, 940 F. Supp. at 829-30; Davies, 994 F. Supp. at 1093-96.

Plaintiff alleges that defendants' exclusionary practices caused harm to the public by reducing the quality and quantity of anesthesia providers in the Clinton-Morrison area, but

because his injuries to his own business and professional interests were not the result of any alleged increase of price or reduction of output, he has not alleged an antitrust injury.  It is true that he is unable to ply his trade as the result of defendants' actions, but the antitrust injury required under the Clayton Act is injury to competition, not competitors, as a result of anticompetitive acts.  Brunswick, 429 U.S. at 488.  Accordingly, plaintiff's claims in Counts I, II, and III must be dismissed.

Alternatively, even assuming that plaintiff has alleged antitrust injury resulting from the blackballing agreement, he is not a proper antitrust plaintiff.  "A showing of antitrust injury is necessary but not sufficient to establish antitrust standing, and a plaintiff may indeed have suffered an antitrust injury yet not be considered the proper plaintiff to bring an antitrust action." Baglio, 940 F. Supp. at 830 (citations omitted).  A proper antitrust plaintiff in this case would be a patient or patients in the Clinton-Morrison area having received, or seeking to receive, anesthesia services who were affected by price increases or reduced output due to the alleged anticompetitive actions of defendants.  See id. at 829-30 (proper antitrust plaintiffs would be consumers harmed by reduction in competition); Davies, 994 F. Supp. at 1096 (same). Plaintiff's alleged injuries do not spring from increased prices or reduced output, but from damage to his own professional interests.  Accordingly, he is not a proper antitrust plaintiff, and defendants' motions to dismiss Counts I, II, and III will be granted.

Defendants Medical Associates and Gateway Surgery have not joined any other defendant's motion to dismiss.  Plaintiff's claims against Medical Associates and Gateway in Counts I, II, and III, however, are based on identical allegations as those lodged against the other defendants.  Because plaintiff's antitrust claims against the moving defendants must be

dismissed, clearly, they also must be dismissed as against the nonmoving defendants, Medical Associates and Gateway.

A district court has the power to dismiss a complaint sua sponte, but this power should only be exercised after service of process; and it is better practice if the plaintiff has notice and the opportunity to respond. Phelps v. United States Bureau of Prisons, 62 F.3d 1020, 1022 (8th Cir. 1995); Smith v. Boyd, 945 F.2d 1041, 1043 (8th Cir. 1991). Plaintiff has served Medical Associates and Gateway, both defendants have answered, and plaintiff has strenuously resisted the motions to dismiss filed by the similarly situated defendants. Accordingly, to preserve resources of both the court and the parties, plaintiff's claims against Medical Associates and Gateway in Counts I, II, and III will be dismissed sua sponte.

## III.    REMAINING STATE LAW CLAIMS

Defendants also move to dismiss the remainder of plaintiff's state law claims. Those state law claims are before the court on supplemental jurisdiction. 28 U.S.C. § 1367. A district court, in its discretion, may, and normally should, decline to exercise supplemental jurisdiction over state law claims when the claims over which the court has original jurisdiction are dismissed before trial. 28 U.S.C. § 1367(c)(3); see United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.")  "In the usual case, if all jurisdiction-conferring claims are eliminated before trial, the underlying values to be considered under the supplemental jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over remaining state law claims."  16 Moore's Federal Practice, § 106.66[2] (Matthew Bender 3d ed.) (internal reference omitted).  Taking those values into consideration, because plaintiff's federal claims

will be dismissed, and there is no independent ground for federal subject matter jurisdiction in respect to plaintiff's remaining state law claims, I will dismiss without prejudice the remaining state law claims in his complaint leaving them for resolution in state tribunals.

## RULINGS AND ORDERS

For the reasons articulated above, the unresisted motion to amend answer filed by defendants Medical Associates of Clinton Iowa, PLC, and Gateway Surgery Center, L.C., is **GRANTED**; accordingly, plaintiff Anthony Schwendinger's Rule 12(f) motion to strike affirmative defenses from the original answer filed by those defendants is **DENIED AS MOOT**; defendant Morrison Community Hospital District's motion to dismiss for lack of personal jurisdiction is **DENIED**; the motion to dismiss filed by defendant Mercy Medical Center-Clinton, Inc., is **GRANTED IN PART** in respect to Counts I, II, and III of plaintiff's complaint, and **DENIED AS MOOT** in respect to the remainder of the counts in the complaint; the motion to dismiss filed by Mark Leding, Stephen Jewell, and James Babeshoff is **GRANTED IN PART** in respect to Counts I, II, and III of plaintiff's complaint, and **DENIED AS MOOT** in respect to the remainder of the counts in the complaint; the motion to dismiss filed by Morrison Community Hospital District is **GRANTED IN PART** in respect to Counts I, II, and III of plaintiff's complaint, and **DENIED AS MOOT** in respect to the remainder of the counts in the complaint.

**IT IS ORDERED THAT** Counts I, II, and III of plaintiff Anthony Schwendinger's complaint are **DISMISSED WITH PREJUDICE**; this dismissal is **SUA SPONTE** in respect to defendants Medical Associates of Clinton Iowa, PLC, and Gateway Surgery Center, L.C.

**IT IS FURTHER ORDERED THAT** supplemental subject matter jurisdiction over

Counts IV through X is **DECLINED,** and Counts IV through X of the complaint are

**DISMISSED WITHOUT PREJUDICE**.

**DATED this 25th day of September, 2013.**

**HAROLD D. VIETOR**
**Senior United States District Judge**